Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought

Counsel for Plaintiffs and the Putative Classes

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| KYLE ATKINS and MICHAEL LUO, individually and on behalf of all others similarly situated, | Case No.: 3:24-cv-04913-RFL |
| *Plaintiffs*, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | Hon. Rita F. Lin |
| AMPLITUDE, INC., a Delaware corporation, | |
| *Defendant*. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................................1

**BACKGROUND** .................................................................................................................3

**STANDARD OF REVIEW** ................................................................................................4

**ARGUMENT** ......................................................................................................................4

**I.     PLAINTIFFS HAVE STANDING TO SUE AMPLITUDE.** ................................4

**II.     PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS FOR RELIEF**..................6

   A.     Plaintiffs Did Not Consent to Amplitude's Conduct. ...........................................6

   B.     Plaintiffs State a Claim Under the CIPA. .............................................................9

      i.     Amplitude acted "willfully"........................................................................10

      ii.     Amplitude was not a "party" to Plaintiffs' communications with DoorDash. ..............10

      iii.     Amplitude intercepted the substantive content of Plaintiffs' communications with DoorDash. ........................................................................12

      iv.     Amplitude intercepted Plaintiffs' communications with DoorDash while they were in transit........................................................................................13

      v.     Amplitude has not established that DoorDash consented. .............................14

   C.     Plaintiffs Have Stated a Claim Under the Pen Register Statute.........................15

   D.     Plaintiffs Have Stated a Claim Under the CDAFA. ...........................................17

      i.     Amplitude construes the term "loss" in the CDAFA too narrowly. .............17

      ii.     Plaintiffs plausibly allege that Amplitude accessed their devices. ..............18

      iii.     Amplitude did not have permission to access Plaintiffs' devices.................20

**CONCLUSION** ...................................................................................................................20

# TABLE OF AUTHORITIES

**California Supreme Court Cases**

*Flanagan v. Flanagan,*
27 Cal. 4th 766 (2002) ...................................................................18

*Ribas v. Clark,*
38 Cal. 3d 355 (1985) ...............................................................10, 11

*Tavernetti v. Superior Court,*
22 Cal. 3d 187 (1978) .....................................................................9

**U.S. Court of Appeals Cases**

*Campbell v. Facebook, Inc.,*
951 F.3d 1106 (9th Cir. 2020) .......................................................6, 7

*Inland Empire Waterkeeper v. Corona Clay Co.,*
17 F.4th 825 (9th Cir. 2021) .............................................................4

*United States v. Christensen,*
828 F.3d 763 (9th Cir. 2016) ..........................................................18

*United States v. Kail,*
612 F.2d 443 (9th Cir. 1979) ..........................................................16

**California Court of Appeal Cases**

*People v. Bollaert,*
248 Cal. App. 4th 699 (Cal. Ct. App. 2016) ...................................10

*Rogers v. Ulrich,*
52 Cal. App. 3d 894 (1975) .......................................................10, 11

**U.S. District Court Cases**

*Astiana v. Ben & Jerry's Homemade, Inc.,*
No. 10-4387, 2011 WL 2111796 (N.D. Cal. May 26, 2011).........................5

*BioCardia, Inc.,*
524 F. Supp. 3d 914 (N.D. Cal. 2021) .............................................6

*Brazil v. Dole Food Co.*,

    935 F. Supp. 2d 947 (N.D. Cal. 2013) ............................................................................4

*Brown v. Google LLC*,

    525 F. Supp. 3d 1049 (N.D. Cal. 2021) ..............................................................8, 15, 20

*Cellars v. Pac. Coast Packaging, Inc.*,

    189 F.R.D. 575 (N.D. Cal. 1999) ................................................................................16

*Cody v. Ring LLC*,

    718 F. Supp. 3d 993 (N.D. Cal. 2024) ...........................................................................9

*Cousin v. Sharp Healthcare*,

    681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......................................................................14

*Doe v. FullStory, Inc.*,

    712 F. Supp. 3d 1244 (N.D. Cal. 2024) .....................................................................7, 8

*Ellusionist Cash Balance Plan & Trust v. Spiegel Accountancy Corp.*,

    No. 23-CV-00287-AMO, 2024 WL 4294645 (N.D. Cal. Sept 24, 2024) ....................7

*Esparza v. UAG Escondido A1 Inc.*,

    No. 23CV0102 DMS(KSC), 2024 WL 559241 (S.D. Cal. Feb. 12, 2024) ...........13, 14

*Greenley v. Kochava, Inc.*,

    684 F. Supp. 3d 1024 (S.D. Cal. 2023) ....................................................13, 16, 19, 20

*Hammerling v. Google LLC*,

    615 F. Supp. 3d 1069 (N.D. Cal. 2022) .................................................................5, 13

*Heerde v. Learfield Commc'ns, LLC*,

    No. 2:23-CV-04493-FLA, 2024 WL 3573874 (S.D. Cal. July 19, 2024) ..................12

*Heiting v. Taro Pharms. USA, Inc.*,

    709 F. Supp. 3d 1007 (C.D. Cal. 2023) ......................................................................11

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,

    402 F. Supp. 3d 767 (N.D. Cal. 2019) .........................................................................8

*In re Meta Pixel Healthcare Litig.*,

    713 F. Supp. 3d 650 (N.D. Cal. 2024) ....................................................................18

*In re Yahoo Mail Litig.*,

    308 F.R.D. 577 (N.D. Cal. 2015)...............................................................................6

*Javier v. Assurance IQ, LLC*,

    649 F. Supp. 3d 891 (N.D. Cal. 2023) ....................................................................11

*Licea v. Cinmar, LLC*,

    659 F. Supp. 3d 1096 (N.D. Cal. 2023) ....................................................................7

*Rodriguez v. Google LLC*,

    No. 2-CV-04688-RS, 2021 WL 2026726 (N.D. Cal. May 21, 2021).....................8, 20

*Shah v. Fandom, Inc.*,

    No. 24-CV-01062-RFL, 2024 WL 4539577 (N.D. Cal. Oct. 21, 2024).......................9

*Silver v. Stripe, Inc.*,

    No. 4:20-CV-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021)...................5

*Smith v. Google LLC*,

    No. 23-CV-03527-PCP, 2024 WL 2808270 (N.D. Cal. June 3, 2024) ........................7

*Turner v. Nuance Commc'ns, Inc.*,

    735 F. Supp. 3d 1169 (N.D. Cal. 2024) ....................................................................11

*Valenzuela v. Keurig Green Mountain, Inc.*,

    674 F. Supp. 3d 751 (N.D. Cal. 2023) ....................................................................11

*Valenzuela v. Nationwide Mut. Ins. Co.*,

    686 F. Supp. 3d 969 (C.D. Cal. 2023) ...............................................................10, 13

*West v. Ronquillo-Morgan*,

    526 F. Supp. 3d 737 (C.D. Cal. 2023) ....................................................................19

*Yockey v. Salesforce, Inc.*,

    No. 22-CV-09067-JST, 2024 WL 3875785 (N.D. Cal. Aug. 16, 2024)....................13

**Statutes**

Cal. Penal Code §§502.................................................................................................18

Cal. Penal Code §631...................................................................................................9

Cal. Penal Code §638.50.......................................................................................16, 17

Cal. Penal Code §§638.51...........................................................................................15

**Secondary Sources**

Restatement (Second) of Torts §652B cmt. b..................................................................6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This case is about a tool, known as a "software development kit" or "SDK," that was developed and distributed by Defendant Amplitude, Inc. ("Amplitude") for inclusion in smartphone applications. The SDK permits Amplitude real-time access to an app user's communications with any app that has incorporated Amplitude's SDK. The SDK also allows Amplitude to track the app user's geolocation. All of the information Amplitude gathers through its SDK is then packaged up with data gathered across multiple devices, touchpoints, and third-party databases to create a uniform profile on the consumer, is either shared with third-party services or used to help improve Amplitude's analytics offerings, and is used to train Amplitude's own AI models.[1] All of this is done without any notice to the app user.

The Plaintiffs here, Kyle Atkins and Michael Luo, are users of the DoorDash app, which incorporates Amplitude's SDK. The SDK allows Amplitude to collect Plaintiffs' geolocation data and any searches they make through the app. This information can reveal a trove of sensitive data. For instance, the geolocation data Amplitude collects will betray where one lives and works, and may also reveal locations associated with medical care, reproductive health, or religious worship. And even seemingly innocuous data like search terms can reveal a consumer's interests or even religious affiliation. (*See* Dkt. 23, First Am. Compl. "FAC" ¶¶ 27-28.) What makes this practice even more troubling is that Amplitude gathers and correlates this data with other data collected

---

[1]    Amplitude attaches a declaration contesting this point. (Declaration of Wang. Dkt. 30-7.) But these allegations are well-pleaded and well-founded, and Amplitude's untested, contrary evidence cannot be relied upon at this stage. *See* https://amplitude.com/msa?t ("Amplitude may use techniques such as machine learning in order to improve the Services, and Customer instructs Amplitude to process its Customer Data for such purpose"); https://amplitude.com/ai ("Leverage state-of-the-art AI recurrent neural networks that understand what your users are going to do next and how to best influence them."); https://amplitude.com/amplitude-audiences ("Real-time syncs and APIs serve customer data to marketing platforms and your product."); https://amplitude.com/docs/get-started/identify-users ("Amplitude can use a user ID to reconcile events across multiple devices under the same user ID. Additionally, Amplitude merges a user's event data on the backend: this connects the correct user ID to any anonymous events the user generated before the assignment of their user ID.").

across the various apps that include its SDK, creating vast digital dossiers on individual consumers. (FAC ¶ 29.)

Plaintiffs allege that Amplitude's conduct violates several laws designed to protect individual privacy, including federal and state wiretapping laws, California's pen register statute, and California's Comprehensive Computer Data Access and Fraud Act (CDAFA).

Amplitude's motion to dismiss focuses primarily on an argument that Plaintiffs consented to Amplitude's conduct. But this argument fails. Framed as an issue of standing, the potential for Amplitude to establish an affirmative defense does not show that Plaintiffs lack standing to litigate their claims in the first place. And framed as an issue on the merits, Amplitude offers nothing to show that Plaintiffs did consent to their conduct, or even that they could have.

Amplitude's other arguments are equally unavailing. Regarding Plaintiffs' state wiretapping claim under California's Invasion of Privacy Act (CIPA), Amplitude cannot escape liability on the pretense that it is a mere extension of DoorDash, because Amplitude uses the information it intercepts for its own purposes. And Plaintiffs' allegations explain how Amplitude receives the substance of Plaintiffs' communications with the DoorDash app in real time, establishing that Amplitude "intercepts" "content" under the CIPA.

Regarding the claim under California's pen register statute, Amplitude implicitly concedes that the collection of geolocation information associated with communications satisfies the applicable definition of "pen register" under California law. But Amplitude contends that because it also intercepts communications that it must be allowed to escape liability under the pen-register statute. But no such distinction is made by the law, and the distinction would, at most, go to show that Plaintiffs have alleged alternative theories of liability.

Finally, under the CDAFA, Plaintiffs have alleged that Amplitude accessed their devices unlawfully. Amplitude contends that liability requires circumvention of technical barriers, or damages related to fixing any intrusion into Plaintiffs' devices, but neither restriction appears on the face of the statute.

The motion to dismiss should be denied.

**BACKGROUND**

Amplitude is a data analytics company whose business model centers on collecting and compiling sensitive, personal information about individual consumers, both for disclosure to advertising networks and to enhance Amplitude's own product offerings. (FAC ¶ 13.) This business model centers on the collection of "first-party data", that is data obtained directly, often surreptitiously, from consumers. (*Id.* ¶ 14.) Amplitude collects this first-party data through its SDK, a collection of reusable pieces of computer code that can be dropped into smartphone applications to execute specific tasks. (*Id.* ¶ 15.)

The purpose of Amplitude's SDK is to collect sensitive information on individual consumers. Amplitude's SDK collects, for instance, identity information (like name, email address, mobile advertising ID), device data (like make and model), precise and timestamped geolocation coordinates, and information about a consumer's in-app activity. (*Id.* ¶¶ 17-19.) Specifically, Amplitude designed its SDK to intercept a consumer's communications and other information shared with an app in real time. (*Id.* ¶ 20.) For instance, in the DoorDash app, a consumer can search for food or restaurants. Unbeknownst to consumers, Amplitude intercepts these searches in real-time, as well as precise geolocation coordinates, name, and email address. (*Id.* ¶ 21.) While seemingly benign, this type of information can reveal plenty of sensitive information about a person, because people order food to where they live and work, where they pray, and where they receive medical care, among other locations. (*Id.* ¶¶ 27-31.)

All of this happens without any notice to consumers, who would not expect that their communications are being secretly siphoned off by a third-party when they communicate with an app. (*Id.* ¶ 22-24.) Indeed, in the case of DoorDash specifically, no notice is provided by Amplitude or anyone else about what Amplitude is doing. (*Id.* ¶¶ 24-25.)

In the end, Amplitude collects consumer behavioral data to create a digital dossier on an individual consumer, uses that data to train its AI model, allows the sharing of this data to ad networks, and even uses the data to help develop products that Amplitude itself sells to businesses. (*Id.* ¶¶ 29-32.)

Plaintiffs are users of the DoorDash app, which integrates the Amplitude SDK. (*Id.* ¶¶ 33, 37.) They contend that Amplitude's data-collection practices violate a variety of state and federal laws.

## STANDARD OF REVIEW

Amplitude moves to dismiss these claims under Fed. R. Civ. P. 12(b)(6). On a motion under Rule 12(b)(6), the Court "accepts all factual allegations as true and draws all reasonable inferences in favor of the plaintiff." *Ng v. Nissan N. Am., Inc.*, No. 23-CV-00875-AMO, 2023 WL 9150275, at *2 (N.D. Cal. Dec. 27, 2023) (quoting *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). "To survive a Rule 12(b)(6) motion, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To grant a 12(b)(6) motion based on an affirmative defense, the defendant must show 'some obvious bar to securing relief on the face of the complaint.'" *Ng*, 2023 WL 9150275, at *2 (quoting *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO SUE AMPLITUDE.

Amplitude first contends that Plaintiffs lack Article III standing because they consented to any disclosures through the DoorDash privacy policy. As explained below, the argument is wrong as a factual matter—there is no basis to conclude that Plaintiffs consented to Amplitude's conduct. But with respect to whether such assent would suffice to show a lack of standing, the argument is legally flawed because the existence of a defense on the merits does not show a lack of standing. *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 834 (9th Cir. 2021) ("One does not lose standing to sue just because his claims may fail on the merits."); *Brazil v. Dole Food Co.*, 935 F. Supp. 2d 947, 962 (N.D. Cal. 2013) ("It may ultimately prove true, as defendants claim, that plaintiffs have no actionable claims. However, that is not the same as finding no standing.")

1   (quoting *Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387, 2011 WL 2111796, at *5 (N. D.

2   Cal. May 26, 2011)).

3       Moreover, established precedent resolves the issue here: The Supreme Court has held that

4   plaintiffs alleging an injury that is analogous to an injury cognizable in a common-law court have

5   standing. *See TransUnion, LLC v. Ramirez*, 594 U.S. 413-417, 424 (2021) ("Central to assessing

6   concreteness is whether the asserted harm has a 'close relationship to a harm traditionally

7   recognized as providing a basis for lawsuits in American courts.'"). And the Ninth Circuit has also

8   concluded that privacy injuries like those alleged here qualify. *See In re Facebook, Inc. Internet*

9   *Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) ("[V]iolations of the right to privacy have long

10  been actionable at common law.").

11      Seeking to convince this Court to chart a different course, Amplitude suggests that a plaintiff

12  may only allege an injury akin to a common-law injury if they can allege a highly offensive

13  invasion of a reasonable expectation of privacy that constitutes an "egregious breach of the social

14  norms." (Mot. at 9.) Amplitude continues that Plaintiffs cannot make these showings because they

15  (supposedly) consented to the relevant conduct. For this invented rule, Amplitude cites cases

16  dealing with claims for invasion of privacy under the California Constitution. Perhaps what is most

17  telling about these cases is that they are *merits* decisions. *E.g., In re Facebook*, 956 F.3d at 601

18  (assessing whether plaintiffs had stated privacy claims on the merits); *Hammerling v. Google LLC*,

19  No. 22-17024, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (ruling that common-law and

20  constitutional privacy claims were properly dismissed on the merits); *see also Silver v. Stripe, Inc.*,

21  No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (considering whether

22  consent defeated various statutory and common-law privacy claims on the merits). This makes

23  sense: A plaintiff's standing to litigate a claim for invasion of privacy (whether under the common

24  law or a statute) is not dependent on whether the plaintiff can establish the elements of a common-

25  law or constitutional claim for invasion of privacy. *See Bell v. Hood*, 327 U.S. 678, 682 (1946)

26  (failure of claim on the merits does not deprive court of jurisdiction); *see also Boston Sci. Corp. v.*

27

28

*BioCardia, Inc.*, 524 F. Supp. 3d 914, 918 (N.D. Cal. 2021) (where standing and merits questions are intertwined, dismissal for lack of jurisdiction is improper).

In any event, when assessing whether an asserted injury is sufficiently analogous to a recognized common-law harm, the question is whether the asserted injury is similar in *kind*, not *degree*. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.); *see also TransUnion*, 594 U.S. at 424 ("*Spokeo* does not require an exact duplicate in American history and tradition."). Amplitude's arguments all compare the degree of harm. But the critical point is that injuries alleged by Plaintiffs—surreptitious interception of private communications and tracking of one's location—are of the *kind* that was historically actionable at common law. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020) ("There is a straightforward analogue between those traditional torts and the statutory protections codified in ECPA and CIPA against viewing or using private communications. Moreover, under the privacy torts that form the backdrop for these modern statutes, '[t]he intrusion itself makes the defendant subject to liability.'") (citing Restatement (Second) of Torts § 652B cmt. b).

In the alternative, Amplitude contends that Plaintiffs lack standing to seek injunctive relief because (again) Amplitude's practices are disclosed (they aren't, as discussed below) and because Plaintiffs are "free to uninstall or stop using the DoorDash app." (Mot. at 10.) But the onus is on Defendant to cease unlawful conduct. There is no doubt that if Plaintiffs use the DoorDash app again, their communications will be unlawfully intercepted by Amplitude. *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 589 (N.D. Cal. 2015) (fact that plaintiffs theoretically could cease using Yahoo mail app to avoid future injury did not mean that plaintiffs lacked standing to sue for injunctive relief regarding alleged interception and reading of emails).

The Court should reject Amplitude's argument that Plaintiffs lack standing to sue.

## II.  PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS FOR RELIEF.

### A.  Plaintiffs Did Not Consent to Amplitude's Conduct.

Moving to the merits, Amplitude again insists that all of Plaintiffs' claims fail because they provided consent. That consent has been established, according to Amplitude, through the

DoorDash terms of service, which Amplitude says may be judicially noticed. The argument fails for multiple reasons.

*First*, Plaintiffs allege that they had no idea Amplitude was intercepting their communications or tracking their geolocation, and that they never consented to such interceptions. Courts generally hold that such allegations suffice at this stage. *See Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1106 (N.D. Cal. 2023).

*Second*, whether or not the various terms of service or privacy policies are subject to judicial notice, "the[ir] mere existence . . . cannot establish at this stage . . . that [the Plaintiff] *did* in fact consent." *Smith v. Google LLC*, No. 23-CV-03527-PCP, 2024 WL 2808270, at *3 (N.D. Cal. June 3, 2024) (emphasis in original). Amplitude appears to appreciate the issue, offering various declarations purporting to establish, as a factual matter, that Plaintiffs must have agreed to these terms. These declarations, which essentially contradict matters alleged in the Complaint, cannot be considered at this stage. *See Ellusionist Cash Balance Plan & Trust v. Spiegel Accountancy Corp.*, No. 23-CV-00287-AMO, 2024 WL 4294645, at *2 n.3 (N.D. Cal. Sept 24, 2024) (refusing to consider declarations attesting to factual matters at the motion-to-dismiss stage).

*Finally*, the cited documents would not establish consent even if they are considered. "On a motion to dismiss, the burden of proof to show consent rests with [the] defendant[]." *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1253 (N.D. Cal. 2024). To establish actual consent based on Plaintiffs' purported agreement to these documents, Amplitude must show that the documents "explicitly notify" Plaintiffs about the challenged practice. *In re Google, Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013). This notification must concern the "specific" practice at issue. *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014): *see Calhoun v. Google, LLC*, No. 22-16993, 2024 WL 3869446, at *5 (9th Cir. Aug. 20, 2024) (consent "is only effective if the person alleging harm consented 'to the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent"). And to obtain dismissal at this stage, Amplitude must show that DoorDash's Privacy Policy admits of only one interpretation, that is, an interpretation which specifically discloses the

challenged conduct. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) ("But recall that in the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation."). Documents that leave some doubt about whether Plaintiffs have consented to the challenged practice will not support dismissal. *See id.* at 789-90 ("if a reasonable Facebook user could plausibly have interpreted the contract language as *not* disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent)") (emphasis in original); *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (rejecting consent defense where privacy policy did not expressly disclose the challenged data collection, and a user "might have reasonably concluded" that the collection did not occur); *FullStory*, 712 F. Supp. 3d at 1254 ("At this point, . . . [h]ow reasonable persons would interpret the totality of the disclosures has not been decided. Accordingly, the claims will not be dismissed for any defendant based on consent."); *Rodriguez v. Google LLC*, No. 2-CV-04688-RS, 2021 WL 2026726, at *4-*5 (N.D. Cal. May 21, 2021) (rejecting argument concerning privacy policy because plaintiffs' contrary reading was "cogent" and totality of disclosures was "confusing" and "fragmented").

Amplitude's cited documents fail to establish consent under this standard. What DoorDash's Privacy Policy says is that usage and geolocation information is provided to "Service Providers" in order "to enable us [meaning DoorDash] to meet *our* business operations needs and to perform *our* Services." (Dkt. 30-5 at 7 (emphasis added).) The policy explains that "service providers" includes "providers of … marketing and advertising services" and "providers of . . . analytics services that help us understand usage of our Services[.]" *Id.* Shorn of context, the references to marketing, advertising, and analytics might refer to Amplitude, but seen as a whole, these disclosures fail to put a reader on notice of Amplitude's conduct. For one, they do not mention Amplitude at all, nor do they even hint at how Amplitude obtains information, specifically by real-time interceptions of a user's communications and location. The Policy instead suggests that DoorDash provides some limited amount of data to unnamed third parties. Second, Plaintiffs allege that Amplitude correlates

the data it obtains by intercepting Plaintiffs' communications with the DoorDash app, uses the information it learns for its own purposes, including to train its own AI models, and shares it with third-party advertisers. (FAC ¶¶ 29-31.) DoorDash's policy cannot possibly be understood to put a user on notice of this conduct. *See Shah v. Fandom, Inc.*, No. 24-CV-01062-RFL, 2024 WL 4539577, at *5 (N.D. Cal. Oct. 21, 2024) ("consent is 'generally limited to the specific conduct authorized[]'").

Thus, consent does not provide a basis to dismiss any of the claims at issue.

**B.    Plaintiffs State a Claim Under the CIPA.**

Amplitude next challenges part of Plaintiffs' CIPA claim on four grounds. All fail.

Section 631(a), the wiretapping provision in the CIPA, is understood to establish three distinct bases for direct liability. *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 192 (1978). The first is not at issue here, because it prohibits telephonic wiretapping, not the intercepting of electronic communications. *See Cody v. Ring LLC*, 718 F. Supp. 3d 993, 999 (N.D. Cal. 2024). The second clause imposes liability on one who "willfully and *without the consent* of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message . . . *while the same is in transit* or passing over any wire, line, or cable, or is *being sent from, or received* at any place within this state[.]" Cal. Penal Code § 631(a) (emphasis added). The third clause of § 631(a) imposes liability on one who "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[.]" *Id.*

Amplitude acknowledges that Plaintiffs' CIPA claim invokes the second clause. (Mot. at 11 & n.9.) But Plaintiffs' CIPA claim also invokes the third clause as well. (FAC ¶¶ 75-76 (discussing Amplitude's use of the information obtained through its unlawful wiretaps).) A claim premised on a violation of clause three is contingent upon a showing that either of the first two clauses were violated, *see In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 827 (N.D. Cal. 2020), but Amplitude does not raise any independent arguments for dismissal of the CIPA claim insofar as it is premised on clause three.

i.    **Amplitude acted "willfully".**

Turning to the clause two arguments, Amplitude first says it did not act "willfully." (Mot. at 11-12.) The Complaint establishes otherwise. As the Complaint explains, Amplitude designed its SDK to intercept a user's inputs into an app in real-time. (FAC ¶ 21.) In other words, Amplitude is not intercepting these communications by accident. The whole point is to obtain this data surreptitiously. This is sufficient to allege that Amplitude acted willfully. *See Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 977 (C.D. Cal. 2023). "Generally," under California law, the word "willfully" implies no more than "that the person knows what he is doing, intends to do what he is doing, and is a free agent." *People v. Bollaert*, 248 Cal. App. 4th 699, 710 (Cal. Ct. App. 2016) (citation omitted). That Amplitude meets that standard is plain from the face of the operative Complaint.

ii.    **Amplitude was not a "party" to Plaintiffs' communications with DoorDash.**

Next, Amplitude urges that it should be considered a party to any communications between Plaintiffs and DoorDash, and not a third party capable of eavesdropping on any conversation.

The argument relies upon the distinction articulated in two California cases: *Ribas v. Clark*, 38 Cal. 3d 355 (1985), and *Rogers v. Ulrich*, 52 Cal. App. 3d 894 (1975). In *Rogers*, the defendant secretly tape recorded a phone call he received from the plaintiff and later replayed that call to a third party. *Id.* at 896. The court held that "participant recording" was not unlawful under § 631, because the statute prohibits secret eavesdropping, and "only a third party can listen secretly to a private conversation." *Id.* at 898-99. In *Ribas*, the California Supreme Court held that § 631 embodies a distinction between "the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device." 38 Cal. 3d at 360-61. *Ribas* involved a plaintiff's suit against his wife's divorce attorney, who was listening to a phone conversation with the wife on an extension telephone line without the plaintiff's knowledge. *Id.* at 358. The divorce attorney, the court held, could be liable under § 631. *Id.* at 361. *Ribas* observed that "an important aspect of privacy of communication [is]

the right to control the nature and extent of the firsthand dissemination of his statements." *Id.* But that right is satisfied by knowing who is listening to a conversation, because one always runs the risk that a call participant will subsequently relay the contents of that call to third parties.

With respect to alleged call participants like Amplitude, district courts applying *Ribas* and *Rogers* ask whether the defendant is *capable* of using what it learns on the call for its own purposes. *See Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023). An entity that is capable of using what it learns for its own purposes is much more like the divorce attorney in *Ribas* than the inanimate tape recorder in *Rogers*. *See Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp.3d 751, 758 (N.D. Cal. 2023) ("An eavesdropper has that capability. A tape-recorder (absent an operator) does not.").

This question is easily resolved here because Plaintiffs allege that Amplitude in fact *does* use what it learns from intercepted communications for its own purposes. (FAC ¶¶ 29-31.) Although Amplitude's SDK may be installed by DoorDash, and employed in the first instance for DoorDash's benefit, Amplitude still makes use of the same information for its own purposes (improving Amplitude's analytics offerings, sharing the data with third-party advertisers, and training its AI). It is therefore a third party to communications between Plaintiffs and DoorDash.

Moreover, even if one were to consider the declaration submitted by Amplitude contesting these allegations (and there is no basis to do so), that still would not help Amplitude because it is clear that Amplitude is at least capable of using the data it obtains for its own purposes, and that's all that's required at the pleading stage. *See Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1017 (C.D. Cal. 2023) ("To ask a plaintiff to plead with great particularity exactly what a third-party software company is capable of doing with data gathered from defendant's website sets the pleading bar too high. Such information appears more likely to be learned in discovery."); *Turner v. Nuance Commc'ns, Inc.,* 735 F. Supp. 3d 1169, 1184 (N.D. Cal. 2024) (denying motion to dismiss § 631 claims where "Plaintiffs have sufficiently alleged that Nuance is capable of using intercepted data for purposes other than furnishing the data back to the client."). The declaration identifies no technical barriers to Amplitude using data collected through its SDK for its own

purposes. Moreover, the declaration very carefully states that Amplitude has never used data *from DoorDash* to improve its AI models (Dkt. 30-7 ¶ 8), while the Master Service Agreement that is cited by the declaration allows that "Amplitude may use techniques such as machine learning in order to improve the Services, and Customer instructs Amplitude to process its Customer Data for such purpose[.]" (https://amplitude.com/msa.) Thus, whether or not Amplitude actually has, or contractually can, use data intercepted from the DoorDash app for its own purposes, it plainly *can*, which is sufficient to show that it is an eavesdropper under § 631.

### iii.    Amplitude intercepted the substantive content of Plaintiffs' communications with DoorDash.

Amplitude next suggests that it has not intercepted any "content," as required for wiretapping liability. *See M.G. v. Therapynatch, Inc.*, No. 23-CV-04422-AMO, 2024 WL 4219992, at *3 (N.D. Cal. Sept. 16, 2024) (noting that both the CIPA and the federal Wiretap Act penalize only learning the contents of a communication). "'Contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). In other words, courts must consider whether the intercepted information is "information *about* a user's communication, [or] the communication itself." *Id.* at 1107 (emphasis added).

The content intercepted here is the substance of Plaintiffs' searches within the app. (FAC ¶¶ 34, 38.) As Plaintiffs allege, even seemingly innocuous searches can be highly revealing, demonstrating likes, dislikes, hobbies, preferences, health conditions, and even religious affiliation. (FAC ¶ 28.) Search terms and the like have been deemed "content" for the purposes of wiretapping claims. *See, e.g.*, *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA, 2024 WL 3573874, at *859 (S.D. Cal. July 19, 2024) ("Search terms constitute 'contents' of a communication."); *see also In re Facebook*, 956 F.3d at 605 (holding that URLs that revealed a user's search terms were the "contents" of a communication).

In seeking dismissal on this ground, Amplitude makes two arguments. First, it focuses on other information obtained by the SDK ("specific input events"). These, it says, are not content. That may well be true, but is irrelevant in light of Plaintiffs' other allegations. Second, Amplitude somewhat bafflingly says that Plaintiffs do not identify any search terms they inputted. That is simply incorrect. (FAC ¶¶ 34, 38.) It is also beside the point: "pleading a CIPA violation does not require identifying a specific communication that was intercepted." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023); *see also Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 977 (C.D. Cal. 2023) (finding interception allegations plausible even though no specific communication was identified).

### iv.    Amplitude intercepted Plaintiffs' communications with DoorDash while they were in transit.

Amplitude next suggests that Plaintiffs have failed to allege that any interception occurs "in transit," as required for wiretapping liability. This argument, too, fails.

What the complaint alleges is that Amplitude receives Plaintiffs' communications with DoorDash in real time, as, for instance, a search query is entered into the app. (FAC ¶¶ 19-20.) In other words, as the Complaint explains, the SDK opens a "data pipeline" that directly siphons off a user's communications with an app. (FAC ¶ 2.) Such allegations are sufficient to allege at this stage that any interception occurs "in transit." *See, e.g.*, *Yockey v. Salesforce, Inc.*, No. 22-CV-09067-JST, 2024 WL 3875785, at *5 (N.D. Cal. Aug. 16, 2024) (defendant was plausibly alleged to have intercepted messages "in transit" because the complaint alleged that the defendant "receives the chat messages either before or simultaneously with its clients—the intended recipients") (quotations omitted); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) (defendant plausibly alleged to have intercepted communications "in transit" because allegations showed that defendant collected communications "during users' usage of non-Google apps"); *Esparza v. UAG Escondido A1 Inc.*, No. 23CV0102 DMS(KSC), 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024) (allegations that messages sent via a webchat feature were read in "real time" sufficient to allege "in transit" interception); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 977 (C.D. Cal.

2023) (holding that Plaintiff sufficiently alleged that messages were intercepted "in transit" when she alleged that the third party "recorded" the "internet traffic" between the user and a website, and that the third party's "business model appears to rely on intercepting all or nearly all messages for mass data analysis"); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1131 (S.D. Cal. 2023) (allegation that website activity was captured in "real time" sufficient to allege that messages were intercepted "in transit").

Amplitude contends that these allegations are inadequate because they do not provide what Amplitude deems sufficient detail about how the SDK works. Plaintiffs acknowledge that a small minority of decisions appear to have required a plaintiff to allege, in detail, how particular lines of code enable a defendant to intercept communications. But these decisions are inconsistent with the general rules governing a plaintiff's pleadings burden. *See Esparza*, 2024 WL 559241, at *3 (reasoning that a pleading standard that demanded more detail "would require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant") (quotations omitted). Plaintiffs' current allegations are sufficient to put Amplitude on notice of the conduct at issue, and why Plaintiffs believe it to be unlawful, which is all Rule 8 requires.

### v.    Amplitude has not established that DoorDash consented.

Finally, Amplitude contends that Plaintiffs' federal Wiretap Act claim is barred because that law requires the consent of only one party, and Amplitude suggests that DoorDash provided said consent. (Mot. at 16.) But the Amended Complaint says nothing of the sort, and Amplitude does not offer any judicially noticeable documents to support this argument. Instead, Amplitude rests its argument on the allegation that DoorDash chose to incorporate the SDK into its app. But this is not the same thing as consenting to wiretapping. In fact, what the documents offered by Amplitude show is that DoorDash agreed to collect information from users and then provide that information to Amplitude, not that DoorDash agreed that Amplitude could intercept communications between users and DoorDash. There is a fundamental difference between these scenarios. In the former scenario, of course, DoorDash remains in control of what data is given to Amplitude, and users can

hold it accountable for those choices. In the latter, Amplitude ingests whatever information it desires, and for whatever purpose. *Cf. Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1068 (N.D. Cal. 2021) (concluding that Google's argument that websites had consented to its interceptions failed because "even assuming that Google has established that websites generally consented to the interception of their communications with users, Google does not demonstrate that websites consented to, or even knew about, the interception of their communications with users who were in private browsing mode").

Moreover, even if one party to a communication has given consent for the communication to be intercepted, liability may still attach if the communication was intercepted for the purpose of committing a crime or (more relevant here) a tort. Here, "consent is not a defense to Plaintiff[']s Wiretap Act claim because their communications were allegedly intercepted for the purpose of associating their data with user profiles, which is a criminal or tortious act in violation of the Constitution or laws of the United States or of any State[,]" including the CDAFA (see below). *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1068 (N.D. Cal. 2021).

Thus, consent does not provide a basis to dismiss Plaintiff's Wiretap Act claim.

### C.    Plaintiffs Have Stated a Claim Under the Pen Register Statute.

Next, Amplitude's arguments for dismissal of Plaintiffs' pen register claim under Cal. Penal Code § 638.51 fail.

*First*, Amplitude focuses on the fact that DoorDash "installed" the SDK, but § 638.51 imposes liability for *either* "installation" or "use" of a pen register, and the latter is plainly alleged here. Plaintiff alleges that Amplitude used the SDK to track individuals' geolocation. (FAC ¶¶ 3-5, 13, 18, 21-24, 34, 38, 59-60.) Amplitude contends that only DoorDash "used" the SDK, but the Amended Complaint alleges that *Amplitude* "collects sensitive data" through the SDK including "precise and timestamped . . . geolocation coordinates." (*Id.* ¶¶ 17-18.)

*Second*, Amplitude contends that the SDK is not a "pen register" because although the SDK records geolocation information, Amplitude reads the Amended Complaint to allege that the SDK

also records the content of Plaintiffs' communications with DoorDash, disqualifying it as a pen register.

The argument should fail. Pen registers have long been used in conjunction with wiretaps. *See, e.g.*, *United States v. Kail*, 612 F.2d 443, 448 (9th Cir. 1979) (discussing pen register used in conjunction with wiretap to intercept both dialing information and call contents). A single device or process could conceivably function both as a pen register (because it records routing, addressing, or location information) and a wiretap (because it records the contents of communications). Section 638.50 does not say otherwise; it does not require that a device be one thing or the other. What that section does is impose a different standard and process for authorizing a pen register (or trap-and-trace device) as opposed to a wiretap (a distinction that also is recognized by federal law). A device's pen register capabilities might well be authorized, even if its wiretap capabilities were not. In other words, that Amplitude's SDK also intercepts communications does not mean that the parts of the code that collect precise geolocation information are not themselves governed by §§ 638.50 and 638.51. The suggestion to the contrary must be rejected.

More fundamentally, Amplitude's position could not support dismissal in any event. Amplitude's position here is inconsistent with its position with respect to Plaintiffs' wiretapping claims that the data collected by the SDK is not "content." Either Amplitude intercepts content or its does not. "A party may plead alternative theories of liability, even if those theories are inconsistent or independently sufficient." *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal. 1999). Thus, even if the Court is unconvinced that the geolocation information recorded by the SDK is separate from the communications intercepted, this would not be a basis for dismissal because further factual development regarding what Amplitude collects will demonstrate whether Amplitude's conduct is prohibited by either § 631 or § 638.51. *See Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 at 1050-52 (holding that plaintiff plausibly alleged claims under both § 631 and § 638.51 concerning an SDK's surreptitious collection of app user data); *see also Rodriguez v. Autotrader.com, Inc.*, No. 2:24-CV-08735-RGK-JC, 2025 WL 65409, at *3-*6 (C.D.

Cal. Jan. 8, 2025) (concluding that plaintiff stated a claim under § 638.51, and that potential

amendment to claim under § 631 regarding same tracking software was not futile).[2]

     *Third*, Amplitude ignores that, in addition to geolocation, Plaintiff alleges that "Amplitude

collects . . . mobile advertisings IDs ("MAIDs"), . . . the consumer's device make and model, and

operating system version" all of which are also dialing, routing, addressing, or signaling

information under § 638.50 and § 638.51. (FAC ¶ 17.)

### D.    Plaintiffs Have Stated a Claim Under the CDAFA.

     Finally, Amplitude seeks to dismiss Plaintiffs' claim under the CDAFA. As is relevant here,

to violate the CDAFA, an entity must either

(1) "knowingly access[] and without permission alter[], damag[e], delet[e], destroy[], or otherwise us[e] any . . . computer [or] computer system . . . in order to . . . wrongfully control or obtain money, property, or data," (Penal Code § 502(c)(1), (2)),

(2) "knowingly access[] and without permission tak[e], cop[y], or make[] use of any data from a computer [or] computer system" (Penal Code § 502(c)(2)), or

(3) "knowingly and without permission access[] or cause[] to be accessed any computer [or] computer system" (Penal Code § 502(c)(7)).

Plaintiffs contend that Amplitude breached these three provisions by coding the SDK so as to allow

it backdoor access to Plaintiffs' devices. As the operative complaint explains, when a user

downloads an app, they expect that they are communicating with the app, and the app only. But

through the SDK, Amplitude has engineered a means of collecting data straight from the phone

itself, which it then puts to use.

### i.    Amplitude construes the term "loss" in the CDAFA too narrowly.

     Amplitude first contends that Plaintiffs have not alleged a cognizable loss. But Plaintiffs

allege that Amplitude used their devices' computing resources, occupied their devices' memory, and

caused their devices to output data over their cellular data plans. (FAC ¶ 67.) These allegations

---

[2]    Amplitude also reprises its contention that consent (through the DoorDash privacy policy) bars this claim on statutory-standing grounds, "because they have not alleged that they were injured by DoorDash's use of the SDK in its app" (Mot. at 17.). As explained above, *supra* Section I, Amplitude's argument is factually incorrect.

identifying "measurable impact" on their devices suffice to allege loss under the CDAFA. *See In re Meta Pixel Healthcare Litig.*, 713 F. Supp. 3d 650, 658-59 (N.D. Cal. 2024) (holding similar allegations to be sufficient).

Amplitude's argument that these allegations do not identify a cognizable loss rests on the notion that the only kinds of losses compensable under the CDAFA are those related to fixing an improperly accessed computer or consequential damages incurred as a result of interruption of computer service. (Mot. at 18-19.) But the CDAFA does not define "damage or loss," nor does it limit a plaintiff to recovery of damages for particular types of harm. *See* Cal. Penal Code § 502(c). In this way, the law is unlike the analogous federal Computer Fraud and Abuse Act, which strictly limits the terms "damage" and "loss." *See* 18 U.S.C. § 1030(e)(8), (11). Some courts, like those cited by Amplitude, have imputed similar limitations on recovery under the CDAFA, but as the Ninth Circuit has observed, "the statutes are different[,]" and should not be interpreted consistently if the language does not dictate such an interpretation. *United States v. Christensen*, 828 F.3d 763 at 789 (9th Cir. 2016). With respect to "damage or loss," although the CDAFA offers an exemplar that is similar to the damages available under the federal law, the law provides only that "damage or loss … *include[s]*" such damages. Cal. Penal Code § 502(e)(1) (emphasis added); *see Flanagan v. Flanagan*, 27 Cal. 4th 766, 774 (2002) ("'Includes' is ordinarily a term of enlargement rather than limitation. The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (cleaned up). There is no basis to limit cognizable damages in the way urged by Amplitude.

### ii. Plaintiffs plausibly allege that Amplitude accessed their devices.

Next, Amplitude argues that Plaintiffs do not allege that Amplitude "accessed" their devices. That is incorrect. Under the CDAFA, the word "access" is defined as "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1). The operative Complaint alleges that Amplitude's SDK permitted the company to "gain entry to" or "cause output from" Plaintiffs' devices (FAC ¶ 66) by providing

Amplitude access to Plaintiffs' communications with the DoorDash app, and causing those communications to be routed to Amplitude. (*Id.* ¶¶ 21-22.)

Nor is Amplitude correct that "access without permission" under the CDAFA requires the defendant to "circumvent technical barriers." As one judge put it, "[c]ircumventing technical barriers may be sufficient to show that a person acted 'without permission,' but that does not mean it is necessary for a person to circumvent technical barriers to act 'without permission.'" *West v. Ronquillo-Morgan*, 526 F. Supp. 3d 737, 746 (C.D. Cal. 2023) (holding § 502(c)(7) claim properly alleged when plaintiff granted defendant limited access to her social media profiles, for a specific purpose, and defendant nevertheless accessed other pages); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023) (rejecting argument the circumvention of technical barriers is required under § 502(c)(7) as inconsistent with plain language of the statute, and holding that "[c]ode hidden in embedded software may plausibly use or take computer data 'without permission'").

Some decisions, beginning with *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010), do reason that access "without permission" under the CDAFA was limited to situations in which the defendant "circumvent[ed] technical or code-based barriers[.]" But later decisions have recognized that the holding of *Power Ventures* itself was not so narrow, and, if so interpreted, would be inconsistent with the language of the statute. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1099 (N.D. Cal. 2015). First, *Power Ventures* largely was concerned about a ruling that access in violation of a terms of use or service would be criminalized, in potential violation of the rule of lenity. (*See* 2010 WL 3291750, at *11.) By offering circumvention of technical or code-based barriers as an alternative, the decision was not drawing a bright line. *See id.*; *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 10992015) ("Nothing in the *Power Ventures* decision held that overcoming 'technical or code-based barriers' designed to prevent access was the *only* way to establish that the Defendant acted without permission.") (emphasis in original). And as *Carrier IQ* further observed, "[h]olding that a defendant acts with 'permission' for purposes of the CCDFA any time it does not need to overcome 'technical or code

based barriers in place to restrict or bar a user's access' leads to results which strain the plain and ordinary meaning of the term 'permission.'" 78 F. Supp. 3d at 1100. The better reasoned decisions, like *Brown* and *Greenley*, reject this atextual barrier. *See also Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) (rejecting *Power Ventures* and reasoning that "[b]ecause plaintiffs have alleged Google's knowing access to, and unpermitted taking of, plaintiffs' app activity data, they adequately state a claim under the CDAFA").

### iii.   Amplitude did not have permission to access Plaintiffs' devices.

Finally, Amplitude contends that Plaintiffs' claims under paragraphs (c)(1) and (c)(2) require Amplitude to know that it lacks permission to access Plaintiffs' devices. To Plaintiffs' knowledge, no court decision has adopted this construction of the CDAFA, and Amplitude does not cite one. But even assuming that this is the correct construction of the statute, Amplitude offers nothing to support the assumption that it thought it had permission to access Plaintiffs' devices. Nothing in the Amended Complaint would support such an inference either.

## CONCLUSION

The motion to dismiss should be denied.


Respectfully submitted,

**KYLE ATKINS and MICHAEL LUO,** individually and on behalf of all others similarly situated,

Dated: February 11, 2025                    By: */s/ Jared Lucky*
                                                 *One of Plaintiffs' Attorneys*

                                            Rafey Balabanian (SBN 315962)
                                            rbalabanian@edelson.com
                                            Jared Lucky (SBN 354413)
                                            jlucky@edelson.com
                                            EDELSON PC
                                            150 California Street, 18th Floor
                                            San Francisco, California 94111
                                            Tel: 415.212.9300
                                            Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought

Counsel for Plaintiffs and the Putative Classes